The immigration judge's factual determinations in this case are contrary to the substantial evidence in the record, and thus the Board's order affirming the immigration judge's decision should be reversed. The late petitioner, Ms. Singh, has demonstrated eligibility for asylum based on past persecution, as well as a well-founded fear of future persecution on account of her Indian ethnicity. First, I'd like to show that the encounters that Ms. Singh had with ethnic Vijans in Fiji following the 1987 coup rise to the level of persecution. It must be noted that Fiji has had four military coups in the last 20 years. Well, there have been a number of coups, but at least as I see the record, if you look at what's going on, the Fijians of Indian descent have essentially made numerous strides. Much of what we're talking about here was in 1986 in that area, and it was threats, there were the robberies, and the destruction of the house, we don't know when that occurred or how, between 1990 and 1994. And the most recent coup was, in effect, as I read the record, at least arguably, or at least the determination was, was a benefit to Fijians of Indian descent. So, A, I'm not sure that whatever was encountered before rises to a sufficient level, nor that there's an anticipation of persecution. Your Honor, all the encounters that Ms. Singh experienced in Fiji with ethnic Vijans when taken cumulatively rise to the level of persecution, and I would like to explain why. And second, well, the most recent coup, the evidence about that coup is not in the record because the most recent coup occurred in December of 2006. So that's basically not part of my argument. Oh, but I happen to live in the Pacific, so I'm familiar with that. We get news of that, so it's true. But it's also true that it's not the most unsettled country in the world. Yes, well, basically, the consequences of the most recent coup are not clear yet, but it's clear that one of the main driving forces behind the coup were continuing ethnic tensions in Fiji. But even if you look back to the 1987 coup, and there were more coups than I ever realized occurred there, the persecution, as I recall, was a couple of robberies, invasion of the home. I mean, not that it's not serious and not that it's not frightening, and I recognize that, but it doesn't seem to rise to the level of some of the kinds of other persecutions involving rape or physical abuse that have in the past been held to show the sort of past persecution, and I'm not sure that we really have that here. Your Honor, this Court has never held that only physical harm rises to the level of persecution. Other types of harm are also sufficient, as well as death threats. This Court has held that death threats alone can constitute persecution, and I would like to refer to this Court's case in Mashiri v. Ashcroft, and to quote text from this decision, this Court said that we have repeatedly held that threats may be compelling evidence of past persecution, particularly when they are specific and menacing, and they are accompanied by evidence of violent confrontations, neo-confrontations, and vandalism. Also in Gafur, which was decided in 2000, this Court said that it has taken the claims of Indian Fijians very seriously because of the severe mistreatment they have suffered in their adopted country, and Ms. Singh here suffered a number of attacks by native Fijians. The most serious one occurred in 1987 when a group of ethnic Fijians broke into her house, threatened to kill the family unless they leave the Fiji, broke a window, fired a gunshot, and yelled that the residents of the house had to leave or they would be killed. It's clear that the Fijians have been here for a number of years. Your Honor. And she had a U.K. passport. Your Honor, this issue is not relevant to the issue of past persecution. What was that? This issue is not relevant to the issue of past persecution. It may be relevant to the issue of a well-founded fear of future persecution, but what this Court held that once an applicant establishes past persecution, it gives rise to a rebuttable presumption of a well-founded fear of future persecution, and the government here failed to rebut that presumption. Well, if an individual — let's just make it abstract for the moment, outside the facts of this case. If an individual has a passport so that she could freely leave to a place like the U.K. and doesn't avail herself of that opportunity, doesn't it call into question just how serious the alleged persecution was? You know, persecution isn't any mistreatment or hardship. It's supposed to be something more extreme. And if you got the chance to go and don't, and I didn't see a real explanation as to why it was that she couldn't leave because she was caring for somebody, something like that, doesn't it cast a shadow on just how serious the alleged persecution was in the first place? Your Honor, I agree that there is no clear explanation in the records why Ms. Sinca didn't leave Fiji earlier. But the judge in this case didn't make an explicit credibility finding. And if there is no explicit credibility finding, this Court's precedent requires to accept the applicant's testimony as credible. Well, no. We're not — it's not that she's incredible. It's just that the degree of persecution is not very severe. And that's a judgment that — as to a judgment of law. There's no reflection on her credibility. It just shows she didn't — she wasn't very afraid. She testified that she was afraid. And because the judge — There's a subjective and an objective aspect to this. Subjectively, I understand she testified she was afraid. But objectively, looking at the facts and circumstances, we don't have, as I indicated, some of the other cases arising, this doesn't get up to that level. And isn't that where the fact that the U.K. passport was available? She stayed. It was never used. It sort of objectively doesn't look like anyone who feels that there's any serious persecution. I'm not saying she may or may not have felt it, but it certainly doesn't look like it. Your Honor, it's correct that the subjective component is satisfied when — satisfied by an applicant's credible testimony that she genuinely fears persecution. In regard to the objective component, it can be satisfied in two ways. Either by establishing that she suffered past persecution in the past or by showing that she has a good reason to fear future persecution. So our position is that Ms. Sinks suffered past persecution. If she stayed in the country for an additional period of time, it's not related to the issue of past persecution. Once an applicant suffers past persecution, it gives — You take the given, you're answering the question. And we're saying the fact that she stayed in the country for an additional period of time raises a question as to just how serious the mistreatment was and whether it rises to the level of persecution. That's a question that the I.J. is entitled to pass on. And the I.J. says it doesn't sound to him — it doesn't appear to him to be sufficiently serious to qualify as past persecution. You are right if past persecution is found, then there is a presumption. But we're still at the first hurdle. The I.J. says, well, the fact that she stuck around suggests it wasn't all that bad, no past persecution. And that undermines the subjective aspect that we're talking about. Well, first of all, Your Honor, the immigration judge's analysis of the past persecution appears to be limited to three sentences. In the first of those three sentences, she said that Ms. Sinks had not made out a case of past persecution. In the second sentence, she said that she was harassed because of her Indian ethnicity. And in the third sentence, she knows that her house was vandalized after she had left the country, so no one was hurting her. She was gone. The house was vandalized. I mean, this is not the kind of — again, I come back to she remains. One of her big arguments is after she's gone, her house was vandalized. And the problem I'm having is this — I mean, normally in the persecution cases that we see, if anything, this person wants to get away and get out, and they come as soon as possible. So all of this comes back to she stayed. One of the big components, she wasn't even there when the house — and who knows what happened to the house. Your Honor, there may be many reasons for a person to stay in the country even if her life was in danger in that country. And I'm not aware of those reasons. So in this case — And we aren't either, isn't that what you — and you just agreed. Nobody's aware on this record. I'm saying that there may be reasons for a petition — for a missing to stay in this country. And the fact that she stayed in this country for a period of time after she experienced mistreatment and harm do not defeat — do not by themselves defeat her asylum claim. Well, the I.J. sort of said it did. And the I.J. said earlier, but she never answered the Court directly as to why she continued to remain in Fiji even though she allegedly had been having trouble since the coup in 1987, speaking at least up to the middle of 1989. So he puts that right out there. And I suppose we could all debate the significance, but our test is would a fact finder be compelled to conclude to the contrary? Why can't the I.J. reason the way that he did? Well, as I said, the issue why she stayed in the country for an additional period of time is related — is more related to the well-founded fear of future persecution than to the past persecution she suffered. The past persecution that she suffered were just a number of acts committed by ethnic Fijians. And why she stayed there longer after these acts were committed is a separate issue. It's not related to the issue of determining whether those acts constituted persecution. I think we have your position on that. Is there something else that you want to talk about? Let me ask a question on your position. I'm a little bit unclear on your position of future persecution in light of the changes in the Fijian government. I'm really not sure I see a specific threat that she's going to be persecuted if she goes back. Your Honor, once an applicant has shown past persecution, there is a rebuttable presumption of future persecution. I understand. But if we say that the past persecution isn't there, are you saying — other than the presumption from the past persecution, is that what you're going to rely on? Or are you saying there is also a palpable threat of future persecution in light of the changes that are cataloged in the record? Yes, Your Honor. I maintain that based on the records, there is still a well-founded fear of future persecution, even assuming for the sake of the argument that Ms. Singh had not suffered past persecution. Okay. According to the Department of State country report for 2003, Indi-Fijians still continue to experience major problems in Fiji. I would refer to page 181 of the appellate record. Even though the Constitution of Fiji requires that any party receiving more than 10 percent of the seats in parliament be given cabinet positions, the Fiji Labor Party, primarily composed of Indi-Fijians, was excluded from the government, and even though the party won substantially — even more than the party won substantially more than 10 percent of the parliamentary seats in the 2001 elections. Also, the same page, country report says that Fijian constitution provides for an ethnically-based electoral system, and the number of government policies on hiring, education, and land tenure preferences provided protection for Indi-Fijians. Also, same page, first sentence from the bottom, ethnic discrimination remains a serious problem. Members of parliament made racial remarks against Indi-Fijians, and evictions of Indi-Fijian tenant farmers continue to occur, although at a lower rate. The report says on page — Okay. I think you've answered the question.  I'm sorry, Your Honor. I think you've answered the question. Thank you. So I would like to continue to quote the report because there are a couple more. We have that in the record, correct? Yes, Your Honor. Okay. We've read it. Anything else? So in regard to — well, my position is that Ms. Singh suffered past persecution, and the government failed to rebut the presumption of the well-founded fear of future persecution. The 2003 country report fails to rebut that presumption, and the 1996 profile of asylum claims and country conditions is not documented, may be used as evidence of the current situation in Fiji because it was issued in 1996, and after 1996, many — actually, two coups happened after 1996. In addition, the Department of State report for 2003 alone is insufficient to rebut the presumption. As this Court said, even assuming, Arguendo, that the report contains evidence of changed circumstances, the government has to explain how these changed circumstances apply to this particular petitioner. And in Molina's trial, this Court said that it has required an individualized analysis of how changed circumstances will affect the specific petitioner's situation, and in order to meet the burden, the government is obligated to present evidence that on an individualized basis rebuts a particular — I have to be honest. I don't understand what you're saying, how it relates to an issue in the case. Right. I don't hear the government trying to say if there's a finding of past persecution, we're still going to look to the subsequent country report. Right. So unless you have something else to speak to, I don't know. I'm confident that what you're saying right now doesn't matter. Is there something else you'd like to speak to? Well, it's this Court's case law. The government has to explain how changed — even if the report contains changed circumstances, the government still has to explain how it applies to this particular individual. Well, that's true only if the finding of past persecution is set aside, which is what I understand this case is about. So if there's anything else you have to say to that, fine. Otherwise, we'll ask the government to speak. That's fine, Your Honor. Fine. We'll hear from the government. Good morning, Your Honors. May it please the Court, I am Blair O'Connor, representing the Attorney General in this matter. Your Honor, the record in this case fails to compel the conclusion that the lead petitioner established her eligibility for assignment withholding of removal. The incident she suffered at the hands of ethnic Fijans follows a case in which an ethnic Fijan woman, following the 1987 military coup, while undoubtedly unpleasant, did not rise to the level of past persecution, as has been found by this case and other Indo-Fijan cases. Furthermore, the immigration judge in this case properly found that the petitioner's continued presence in Fiji, despite having a U.K. passport and the country conditions in Fiji at the time of her asylum hearing, did not support a finding that she had an objectively reasonable, well-founded fear of future persecution. With respect to the daughter's petition for review, she was properly considered a citizen and national of the United Kingdom, as she admitted during her removal proceedings. She has never lived in Fiji or shown a right to residency in that country, and therefore she was not eligible for asylum from Fiji in her own right. Accordingly, because the mother's application is properly denied, furthermore, the daughter cannot assert any rights under the Child Status Protection Act. Therefore, these petitions for review should be denied. Now, with respect to the petitioner's claim of past persecution, it is important to note that she has not claimed to have been physically harmed by ethnic Fijians at any time during her residence in Fiji. Instead, her grandmother's house, where she was staying with relatives, was twice robbed by ethnic Fijians. Most notably, however, during one of these two robberies, petitioner's male relatives successfully fought back and drove the attackers from the house. Now, the record is unclear whether this occurred during the first or second robbery, but it's very significant to note that the home was then left undisturbed until it was left unoccupied in 1994. Furthermore, although petitioner's family's jewelry, food, and livestock were stolen during these two robberies, there is no evidence that her family did not continue to receive income from their sugarcane farm, which they continued to hold until it was seized in 1994. The only other incident petitioner experienced while in Fiji was the interruption of a temple service by ethnic Fijians that took over a Sikh temple. Therefore, petitioner's experience, considered in the aggregate, do not rise to the level of mistreatment experienced by those Indo-Fijians that this court has found have established past persecution. The cases where the court has found past persecution speak to multiple stabbings, multiple beatings, 10 to 15 robberies, the complete inability to have an income, and the experiences here just do not rise to that level. Moreover, as this court has noted during the appellant's argument, the fact that petitioner continued to reside in Fiji following the two robberies at her grandmother's house, notwithstanding the fact that she possessed a valid multiple entry visa to go to the United Kingdom where her children were residing, does undercut her claim that the experiences in Fiji were so severe and egregious that they rose to the level of past persecution. As the immigration judge noted on page 10 of his decision, the court does not understand why, if the situation was so terrible, that she would not have left before that time. Therefore, the immigration judge's finding that there was no past persecution is based on substantial evidence. Furthermore, petitioner failed to establish a well-founded fear of future persecution. It was found not to be objectively reasonable, given the fact that she did remain in Fiji following the two robberies, even though she had a U.K. passport and visa, and also given the current country conditions in Fiji at the time of her asylum hearing. The immigration judge properly found that significant changes had obviously taken place in Fiji in the 14 years since petitioner left there following the 1987 military coup. Although the State Department report does acknowledge that there still was ethnic tension between Indo and ethnic Fijians, the State Department also said that there is nothing to indicate that the current Fijian government was unwilling to protect Indo-Fijians from harassment and discrimination. The report notes that the 1997 Constitution, which was put into place following the 2000 coup, did eliminate previously ethnic-based factors which favored ethnic Fijians' representation in government and assured greater equality in the ethnic composition of the government. More importantly, the Constitution created an independent Human Rights Commission, which heard a number of racial and ethnic equality issues. Therefore, should petitioner be deported back to Fiji and she experiences harassment and discrimination from ethnic Fijians, the Human Rights Commission would obviously investigate those claims. The Constitution also guarantees the same thing that we said to petitioner's counsels. We're familiar with the record, so you needn't take us through that on a step-by-step basis. Yes, Your Honor. The only other issues I'd like to discuss, then, is that the government does contest the challenge that asserted by petitioner in her brief that the immigration judge failed to consider that ethnic Fijians were a disfavored group under this Court's sale and low-long analysis. Again, the thing to emphasize is that this Court is looking at the record as it existed during the asylum hearing in 2004. While Indo-Fijians may have constituted a disfavored group in the immediate aftermath of the 1987 military coup and possibly in the weeks and months following the 2000 coup, they certainly did not constitute a disfavored group at the time of the 2004 asylum hearing for the reasons I previously stated due to the conditions in Fiji at the time of that hearing. The only other issues that I would bring up to the Court is that, again, because the lead petitioner of the mother's asylum application was properly denied, that moots out the daughter's claim that she was entitled to protection under the Child Status Protection Act. The applicant's parent has to be granted asylum in order to arrive at derivative status. Because she was properly denied, she doesn't have any protections. Furthermore, she presents no evidence showing that the government was obligated to continue her case until the adjudication of the mother's asylum application before deciding her case. The reason for the delay in this case probably was because the father did have temporary lawful status until it was terminated in December of 1998, at which time the mother's asylum application, she was called in for an interview and a new application was filed. And, again, it's well settled that aliens have no entitlement to be placed into deportation proceedings instead of removal proceedings. Therefore, her argument, her claim that she should have been allowed to apply for suspension of deportation instead of cancellation of removal must also fail. Furthermore, we would note that because she did not have seven years' continuous presence, by April 1, 1997, when her rear went into effect, she wouldn't have been eligible for suspension of deportation anyway, even had she been placed into deportation proceedings. So barring any further questions from the Court, Your Honor, the government would ask that both these petitions for review be denied. Thank you for the argument. It's a rebuttal. The government maintains that the incidents of harm suffered by missing in Fiji do not constitute persecution and that the opposing counsel stated that incidents like stabbings, beatings, multiple robberies, et cetera, extreme situations like that are required to show past persecution. However, as I said earlier, death threats when committed in the context of widespread attacks and violence constitute persecution. And here the petitioner suffered death threats. When ethnic Fijians attacked her house, they clearly indicated that the family would be killed unless they leave the country. But she didn't leave the country. Well, Your Honor, to show persecution, she doesn't have to show that she was killed. No, but it suggests that she didn't take the threats very seriously. The record indicates that the threats were serious because the petitioner's next-door neighbor was killed. If somebody comes to me and says, leave the country or you're killed, and I don't leave, can't that be inferred that maybe I don't believe the threat is serious? Not necessarily, Your Honor. I don't offer any other reason for sticking around. I think that's the core problem with this case. And the IJ makes it clear that the opportunity was there to explain it and it just didn't happen. She's holding a valid U.K. passport. She's suffering persecution and just kind of stays with no explanation. Your Honor, again, I think I attempted to address that issue earlier. I'm not sure if I satisfied the court. But petitioner's next – I would like to repeat that the petitioner's next-door neighbor was killed and her daughter – his daughter was seriously injured by ethnic Fijians. And also, there was objective information about the country conditions at that time that ethnic Indians experienced serious threats and experienced serious mistreatment and that the mistreatment was real and that the threats were real. In regard to the disfavored group issue, Indians in Fiji continue to constitute a disfavored group. And based on the 2003 country report, which is in the appellate record, they still continue to suffer harm in Fiji and that harm goes beyond mere discrimination. That harm is suffered in the political sphere, in the economic sphere. And also, I would like to point out that the 2003 Department of State report says that one-fourth of all the complaints regarding human rights violations filed with the Human Rights Commission in Fiji was concerning ethnic problems. In regard to Ms. Kamal Burke, she's a – if Ms. Singh has her hand up. I'm sorry. In regard to what? To the second case, to Ms. Kamal Burke, whose case was consolidated with Ms. Singh's case. If Ms. Singh is granted asylum, Ms. Kamal will receive asylum derivatively based on the Child Status Protection Act and will maintain that Ms. Singh is eligible for asylum based on past persecution as well as based on her well-founded fear of future persecution. That's all I have. Thank you. Thank you both counsel for the argument. The case just argued is submitted.
judges: Noonan, Clifton: Schiavelli